[No. B093599. Second Dist., Div. One. Aug. 1, 1995.]

LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
HELLEN JONES, Real Party in Interest.
JOE BEN HUDGENS et al., Objectors.

**COUNSEL**

De Witt W. Clinton, County Counsel, Joe Ben Hudgens, Principal Deputy County Counsel, and John W. McCauley, Deputy County Counsel, for Petitioner.

No appearance for Respondent.

Susan Crane for Real Party in Interest.

Jones, Day, Reavis & Pogue and Elwood Lui for Objectors.

Teri L. Robinson for Minor.

**OPINION**

**VOGEL (Miriam A.), J.—** ██ The Department of Children and Family Services, represented by County Counsel, filed a petition for a writ of mandate accompanied by a request for an order changing the placement of Aquela P. (known to her family as Amber) or, in the alternative, for an order staying enforcement of an order of the juvenile court which permitted Hellen Jones, Amber's great-aunt and court-appointed foster mother, to take her out of the state on a five-week vacation. We saw no reason to change Amber's placement but the petition appeared to raise a legitimate question about the juvenile court's jurisdiction to permit the out-of-state trip and a visit with an unrelated adult, and we therefore issued a stay order and a request for immediate opposition so we could address the merits of the petition before Ms. Jones's planned departure date.

Unconcerned with our denial of the request for an order changing custody, Kate Hand (the social worker assigned to Amber's case) arranged to have Melissia Groomes, Amber's aunt, meet her at Amber's day care facility and take custody of Amber away from Ms. Jones (despite Ms. Jones's assurance that, in light of the stay order then served on her, she would cancel her vacation plans). Two days later, Ms. Jones asked the juvenile court to order

the Department to return Amber to her custody, which the juvenile court did. Undeterred, County Counsel then asked us to "clarify" our earlier order to make it clear that we intended a change of custody. Since we never intended a change of custody, we declined and ordered the Department to return Amber to Ms. Jones.

When we ultimately received transcripts of the proceedings along with opposition to the petition filed by Amber's attorney, we not only denied the petition but ordered the Department and County Counsel to show cause why sanctions should not be imposed against them. They responded in writing and, represented by private counsel retained for the OSC proceedings (Mr. Elwood Lui), appeared in court as directed.[1] For the reasons we will explain, we conclude that the Department and its attorneys demonstrated an arrogant disregard for the orders of the juvenile court and this court and lost sight of their *raison d'être*—to protect the best interests of the child involved in these proceedings—and that this is an appropriate case for the imposition of substantial sanctions.

BACKGROUND

A.

For almost three years, Ms. Jones has been Amber's court-appointed foster mother and Amber, who is now eight, calls her "Mommy."[2] In March 1995, Ms. Jones called Amber's social worker (Kate Hand) to obtain permission to take Amber on a trip to Texas. Ms. Jones explained that she was planning a combined business trip and vacation for herself, her own eight-year-old son (Justin) and Amber. While Ms. Jones attended to business, she proposed leaving the children with Justin's father (Earl Coleman) who lives in Dallas and she explained that arrangements had been made for both children to attend a YMCA day camp, take swimming lessons and participate in computer classes at a local college.

---

[1]*None* of our comments about the attorneys representing the Department are directed at Mr. Lui.

[2]In September 1992, Amber and her five siblings were declared dependent children of the court pursuant to *Welfare and Institutions Code* section 300. Amber was placed with Ms. Jones, two siblings were placed with Melissia Groomes (an aunt) and the other three children were placed with other relatives. Amber's mother was and still is physically disabled and unable to care for her children, and the whereabouts of Amber's father are unknown.

Ms. Hand's response was that she did not approve of the trip and would not approve it.[3] When Ms. Jones asked if there was someone to whom she could "appeal" that decision, Ms. Hand offered no assistance and, every time Ms. Jones called, Ms. Hand had one excuse or another about why she didn't have time to discuss the matter with her. Ultimately, Ms. Jones made her way to a supervisor, Ms. Virgie Boykin, who explained that, according to the Department's policy, Mr. Coleman would have to be investigated through interstate procedures and that Mr. Coleman would have to obtain a "foster license."

Ms. Jones talked to Mr. Coleman and they agreed to do whatever was necessary. Accordingly, Ms. Jones again called Ms. Hand, requested the "interstate transfer" she had been told would be necessary, and provided identifying information about Mr. Coleman. Ms. Hand said she would not approve such a transfer and would not provide further information to Ms. Jones. When Ms. Jones asked to speak to her supervisor, Ms. Hand's response was that she had already done so and that he (her supervisor) agreed with her (Ms. Hand). Ultimately, Ms. Jones found the supervisor (Hermes Cruz) and he confirmed Ms. Hand's representation that he would not approve Ms. Jones's request. When she persisted and asked whether it was impossible to obtain approval of an interstate transfer, Mr. Cruz said it was "not impossible" but "he would not consider it."

## B.

Ms. Jones then contacted Amber's attorney, Teri Robinson, and explained what she wanted to do. Ms. Robinson asked Ms. Jones to send her a letter explaining her plans and then offered to apply for court approval for the trip.[4] On May 30, 1995, Ms. Robinson presented Ms. Jones's request to the juvenile court (Hon. Marilyn Kading Martinez, Judge Pro Tempore) and the court, in turn, indicated its intention to grant the request. Although the

---

[3] It bears noting at this point that, despite the Department's statutory obligation to regularly check on the status of foster children, Ms. Hand and others in the Department who preceded her involvement with Amber knew that Ms. Jones was a responsible foster parent and that Amber was in good hands and, as a result, rarely, if ever, contacted Ms. Jones to check on Amber's status. As a practical matter, therefore, Ms. Jones could have simply taken the trip and never notified the Department of her plans to take Amber out of California. Instead, she played by the rules.

[4] Ms. Jones did as requested and sent a formal letter to Ms. Robinson, explaining her plans as described above. She also explained that Mr. Coleman had lived in California until last fall, when he was transferred by his employer, General Telephone Company, to Dallas. Until that transfer, he regularly visited Justin at Ms. Jones's home and he always included Amber in his activities with his son. Ms. Jones added: "Mr. Coleman has known our family for the last twenty years. He knew [Amber's] great grandmother, grandmother, and mother. He is a fine law abiding citizen and could provide the highest references."

Department (represented by Deputy County Counsel John W. McCauley) conceded it had no adverse information about Mr. Coleman, it nevertheless objected to the request on the ground that it is "the policy of the Department . . . that these foster children should not be sent out of state with unrelated caretakers or individuals who have not been charged by the court through the foster care licensing with the care of these children."

When the court reminded Mr. McCauley that, more than a month before the hearing, Ms. Jones had provided Ms. Hand with Mr. Coleman's address, birthdate and other identifying information so that his background *could* be checked, Mr. McCauley's only response was that Ms. Hand had told him she had not been able to obtain the information she needed from Ms. Jones.[5] After further discussion (during which the attorney representing Amber's mother informed the court that Amber's mother was in favor of the planned trip), the court granted the request.

Mr. McCauley asked for a stay. At that point, Ms. Robinson suggested the following approach: "[I]f the Department finds something between now and when this visit begins—which is not for another month—if they find out the man is an axe murderer, they can certainly walk it on. But my client for a month has been trying to get this man interviewed by the Department unsuccessfully." The court responded: "Here's the situation. [Amber] lives with her foster mother, who is her relative, maternal aunt. And a review of the report shows that [Amber's] been doing well with this caretaker. We charge our caretakers, who we determine to be responsible, to make decisions for the children: If they can stay overnight at a slumber party, with a friend from school, if they can go to a birthday party with friends from school, they can go to Disneyland.

"It would appear that . . . Ms. Jones has a great deal of information about Mr. Coleman. In fact, as I read the report, Mr. Coleman is the father of Ms. Jones' son. And although Mr. Coleman and Ms. Jones do not live together and are not married, Ms. Jones appears to have a very high regard for Mr. Coleman, such high regard that she is sending her own son to have a summer vacation with his father. Mr. Coleman knows [Amber] because [Amber] has

---

[5]This statement was not true. According to Ms. Robinson, she personally tried to contact Ms. Hand to discuss the planned vacation. First, she was told the social worker was on leave. When counsel finally "tracked down the [social] worker handling the case, [she] was informed the Department would not approve the vacation request because Mr. Coleman is an unrelated caretaker," not because needed information had not been provided. In short, the evidence suggests Ms. Hand *was* given the information she needed and she simply refused to pursue the matter—a fact she essentially admitted when, in response to our OSC, she stated in her declaration that a "quick search" of Mr. Coleman conducted *before* May 25 revealed no criminal record.

resided with Ms. Jones for a substantial period of time. The plans are that the children would attend the YMCA program. They would have horseback riding, computer training.

"It would seem . . . that although the social worker has had adequate time to gather information and has not, that Ms. Jones herself, as a qualified caretaker, has fully evaluated the situation and believes that it will be a wonderful opportunity for [Amber] to have a vacation.

"Furthermore, it is Ms. Jones who will, in fact, be taking [Amber] out of state, because Ms. Jones will be also taking a summer vacation, which shall begin in Texas so that she can visit relatives. Now, during a portion of that time, she will not be there because she has business-related trips, such that she cannot care for [Amber] this summer. So if [Amber] does not go with . . . her cousin, who's going to visit his father, then [Amber] would have to be put in a foster home.

"So weighing and balancing and not having any evidence that Mr. Coleman is other than appropriate and that the caretaker is the one who will be taking the vacation out of state and get [Amber] and her son arranged and settled, I authorize the vacation. However, I order the Department to continue with their follow-up, and if there is evidence that, Mr. McCauley, you believe will persuade the court to reconsider its decision, *then you shall present that to the court prior to Ms. Jones going on her vacation. And she intends to leave June 24th. So that gives you about a month to complete this evaluation. If I don't hear from you, I will assume your evaluation is complete, and you are satisfied that it is appropriate.*

"So I authorize an out-of-state vacation for [Amber] to the State of Texas *to begin approximately June 24th* and extend for approximately five weeks. Her caretaker will provide the transportation. And I deny [the] request for a stay." (Italics added.)

Unpersuaded, Mr. McCauley responded: "As far as my client is concerned, even if Mr. Coleman is appropriate, state policy precludes him as a non-foster care, nonrelated caretaker from taking foster children out of state. And, therefore, the record should be clear the Department adamantly opposes the court's ruling . . . ." The court tried once again: "You have made your record. I will emphasize that this is a vacation, not an out-of-state placement."

### C.

On June 13, the parties were back in court with Mr. McCauley asking for reconsideration of the order allowing Amber to take a vacation. Mr. McCauley "reminded" the juvenile court that it had said "that in the meantime,

before June 24th, that I could walk the matter back on should there be a change of circumstances or further information. I have further information, Your Honor, that foster care is not the only option. We have a maternal aunt by the name of Meliss[i]a Groom[e]s who wishes to take care of [Amber] during the time of the current caretaker's absence out of the state. That she . . . also has [Amber's] siblings—Miranda and Jovan—in her care now. So she is a DCS-approved placement. [Amber] could go there immediately upon her foster caretaker leaving on her business trip [and] be able to visit with her siblings . . . . Meliss[i]a Groom[e]s has agreed to this and asked that [Amber] come and join her during the five or so weeks that [Amber's] foster caretaker will be out of the state. And, your honor, there's a Legislative preference for visitation with siblings—[Welfare and Institutions Code section] 361.3 . . . ."[6]

On Amber's behalf, Ms. Robinson objected. "I find it very interesting that the Department, rather than allowing this child to go on the visit and follow up on the investigation of Mr. Coleman, has now decided to turn the corner, go and seek the other relatives out. This is not an aunt that has said, I want to take care of Amber for the summer. This is a person who has been contacted by the Department when the Department has said, will you take this child instead of her going to Texas? That's a whole different thing than what this code section is talking about.

"After Mr. McCauley told me of the plans of the Department, I also find it interesting that they haven't bothered to provide the court with the information about Mr. Coleman that they still haven't bothered to obtain. Ms. Jones indicated . . . that the biggest thing is that . . . [Amber] thinks—she's been told she's going to Texas for this vacation. The swimming lessons have been paid for. The YMCA program has been paid for.

"Another thing is the current caretaker, Ms. Jones, does not approve of this aunt where [Amber]'s going to go spend the summer. *This woman [Ms.*

---

[6]All section references are to the Welfare and Institutions Code. When a minor is adjudged a dependent child of the court under sections 300 and 361 and it is not feasible to place the child with a parent, subdivision (d) of section 361.2 authorizes placement of the child in the home of a relative, a foster home, a suitable licensed community care facility, a foster family agency for placement with a suitable foster family and elsewhere under special circumstances which have no application to this case. Under section 361.3, the decision about where to "place" a child among the possibilities listed in section 361.2 is supposed to be based upon the best interests of the child, the wishes of the parent, placement of siblings, and so on. Amber is "placed" with Ms. Jones and has been for three years, and the only issue before the juvenile court was whether Ms. Jones could leave Amber with Mr. Coleman for a portion of their five-week stay in Texas. Accordingly, Mr. McCauley's suggestion that Ms. Groomes was entitled to preference because two of Amber's siblings live with her had nothing to do with the matter then before the court.

*Groomes] has three children [of] her own, Amber's two siblings, plus another adult in the house in a two-bedroom home. And the Department is going to add yet another child in that home?* Ms. Jones wants Amber to have activities that are going to help her continue to grow and develop over the summer. *She believes truthfully if Amber goes to her aunt's home, she's going [to] sit in front of the TV and watch the trial all summer long. And she's also concerned that behavior problems that the siblings are exhibiting are going to be with Amber.*

"Amber has a long relationship with Mr. Coleman. He exercises his visits with his son. Amber sees him as a father/uncle kind of figure. She goes on the visits when he exercises his visits with his son. The bottom line is if the Department insists on moving Amber to this other relative's home, this may well be a permanent move because Ms. Jones may refuse to take this child back if her behavior deteriorates, as she believes it may." (Italics added.)

Amber's mother's attorney again sided with Ms. Jones: "Your honor, we have had in place now for some time good placements for all of Mary [P.'s] children with her relatives. I think this presents a unique opportunity for this child to further her education just in terms of seeing new areas, new territory. Furthermore, nothing Mr. McCauley cites in any way diminishes the court's authority to exercise the court's discretion to allow such a visit or a trip or a vacation or what have you. Furthermore, County Counsel fails to cite any even potential risk that accompanies this vacation request. I simply don't see any basis for the court's changing its indicated ruling the last time the matter was brought on."

Notwithstanding Mr. McCauley's insistence that Ms. Groomes was really quite "anxious" to have Amber stay with her, the court confirmed its earlier ruling, reiterating its finding that the issue was not placement, only vacation plans. The court added: "Furthermore, placement with the aunt and the cousins and the siblings, these people appear probably to be like strangers to [Amber]. And so I don't have any statement from [Amber] whatsoever that she knows these people. She may feel uncomfortable.

"Furthermore, she, in fact, will be with a relative during this vacation. Her caretaker, Ms. Jones, is her relative. She will be on vacation in part with Ms. Jones, but in totality with her cousin, who is Ms. Jones' son. Furthermore, it appears that an enriched vacation has been arranged for this child, and this court is happy to note that this caretaker appears to be such a fine caretaker that she has arranged such an enriched and exciting vacation for this child. No doubt this child will have her horizons expanded, learn about another state, and I don't have any basis whatsoever to deny this child this fine opportunity. And that concludes the hearing."

Undeterred, Mr. McCauley complained that Ms. Jones would be with Amber for only a few days out of the five-week vacation period. The court corrected him: "As I understand it, Ms. Jones will be going to Texas with her son and her niece, and they will be visiting relatives in Texas. That then, Ms. Jones . . . has business responsibilities which would require her to travel, and she is not able to take the children with her. And so she has arranged for this vacation for her niece and her son in Texas while she is traveling, and when her business is completed, so will the vacation be completed, and her niece and her son will return with her to California."

Mr. McCauley insisted that, according to his reading of Ms. Jones's letter to Ms. Robinson, the important point was that Ms. Jones would be returning to California separately from the children. The court observed that he was technically correct but that Mr. Coleman would be returning the children to California at the same time, and asked rhetorically, "Is Ms. Jones intending to abandon them?" Incredibly, Mr. McCauley answered: "She is, in fact, intending to abandon them there. She's going to be there for a few days, and Mr. Coleman is going to be the sole caretaker." After more of the same, the court put an end to it:

"Mr. McCauley, stop. It really isn't important if the children are on the plane with Ms. Jones or with Mr. Coleman. The fact is they are simply on vacation. At the end of the vacation, they will return to California and resume residence with Ms. Jones." Once again, the court denied Mr. McCauley's request for a stay.

### D.

On June 19, Principal Deputy County Counsel Joe Ben Hudgens filed a petition for a writ of mandate and a request for an immediate stay. The transcripts of the May 30 and June 13 hearings quoted at length above were not, however, filed with the petition. Instead, we were given Mr. Hudgens's version of what had occurred with regard to Ms. Jones's request to take her niece on a vacation. According to Mr. Hudgens, the juvenile court acted arbitrarily and in excess of its jurisdiction when it "ordered that [Amber] accompany [Ms.] Jones to Texas and be left there for four to five weeks in the sole care of Earl Drayland Coleman, a person neither related to [Amber] nor licensed by the State of California to provide foster care. It is anticipated that [Amber] will be taken out of the State of California as early as June 20, 1995, but certainly no later than June 24, 1995."

Without mention of Amber's attorney's objection to Ms. Groomes as a substitute caretaker, Mr. Hudgens told us that Ms. Groomes, "who already

cares for [Amber's] two siblings," was ready and willing to care for Amber in Los Angeles during Ms. Jones's absence. Based on these incomplete allegations, Mr. Hudgens asked for an immediate order "commanding that [Amber] not leave the State of California, *and that [Amber] be placed forthwith in the home of [Ms.] Groom[e]s; and prohibiting [the juvenile] court from taking any further action . . . to enforce or implement its orders of May 30 and June 13. . . .*" (Italics added.) In a supporting declaration, Mr. McCauley chimed in: "While [Amber's] counsel represented that [Amber] and [Ms.] Jones would commence this trip . . . on Saturday, June 24, . . . *I am informed, and thereupon believe, that this trip will commence tomorrow morning, June 20, 1995.*[7] *Therefore, it is essential that the Court of Appeal grant a stay of the [juvenile] court's order and command that [Amber] not be taken out of the State of California until this matter can be fully argued.*"

### E.

On the incomplete record before us, it appeared there might be some legal impediment to the juvenile court's order and, on the same day the petition was filed (June 19), we therefore issued a temporary stay order and request for opposition. This is what our order stated:

"Good cause appearing therefor, the May 30, 1995 order permitting [Ms. Jones] . . . to take [Amber] out of the State of California and leave her with an unrelated caretaker in the State of Texas, is stayed." Opposition was requested by June 23 which, we hoped, would make it clear that we intended to rule before the planned vacation was scheduled to begin. *No affirmative relief of any kind was mentioned and the order did no more than it said—it stayed the juvenile court's order which authorized Ms. Jones to take Amber to Texas. By necessary implication, it also denied the Department's request for an order changing Amber's placement.*

### F.

Ms. Hand nevertheless arranged for Ms. Groomes to meet her at Amber's day care center[8] and to have Ms. Jones await their arrival at the center when she came. When Ms. Hand arrived, she gave Ms. Jones a copy of our stay

---

[7]As will appear, the sole source of this "belief" is an unconfirmed statement by Ms. Groomes that Ms. Jones told her on *June 6* that she might leave on June 20. Indeed, according to Ms. Hand's July 7 declaration, Ms. Groomes told her of the planned June 20 departure at about that same time and well before Mr. McCauley's application to the juvenile court for reconsideration, yet he said nothing about it during the June 13 hearing. There was ample time for Ms. Hand to call Ms. Jones or to ask Mr. McCauley or Mr. Hudgens to ask Ms. Robinson to ascertain the precise date of Ms. Jones's planned departure.

[8]In their written opposition to our OSC re sanctions, the Department and County Counsel claim they "determined to transfer temporarily the custody of the minor from real party in interest [Ms.] Jones *because of facts occurring subsequent to the issuance of the stay order.*" The record defeats this assertion. Ms. Hand's call to Ms. Groomes on June 19 to request that

order. Ms. Jones read it, understood it and, in response, told Ms. Hand that she would change her travel plans. When Ms. Jones took Amber by the hand to lead her to her car, Ms. Hand intervened and ultimately took the child, crying and visibly upset, and turned her over to Ms. Groomes.

On June 21, Ms. Robinson's colleague, Amy Guy, applied to the juvenile court for an order directing the Department to immediately return Amber to Ms. Jones, on the ground that our stay order simply delayed the vacation and did not authorize a change of placement. Ms. Guy explained to the court that, as a result of these events and of discussions Ms. Robinson had with Ms. Groomes, Amber's attorneys (Ms. Robinson and Ms. Guy) were concerned about Ms. Groomes's behavior and the well being of Amber's siblings (who they also represented). Amber's mother's attorney then explained that Amber's mother (who is confined to a nursing home and whose attorney questioned her mental competency) had received several "agitating" calls from Ms. Groomes in an effort to influence the mother to change her position about whether Amber should take the planned vacation.

The juvenile court was not impressed with the Department's conduct: "I am extremely disturbed with the Department . . . . On the very moment that the Court of Appeal's decision came out, they saw fit to go to the child's child care and remove the child without any advance notice. There was no reason that I know of to do that when the vacation was not beginning until June 24th. If there was any doubt in the Department's mind, they could have contacted Ms. Jones and asked her exactly when she was leaving and informed her that the child's bag should be packed to go to the aunt's home while she was on vacation.

"This child is young, and to not have any ability to say good-bye to [Ms. Jones], to not have the ability to pack her bag or favorite doll, to not be informed by the person who loves her, cares for her that she's not able to

she drive more than 60 miles from her home to meet Ms. Hand at Amber's San Bernardino day care center demonstrates the Department's preexisting determination to take Amber away from Ms. Jones no matter what she said or did and no matter what we did or didn't do. Ms. Groomes's June 21 declaration states that, on June 19, Ms. Hand "received the stay order from the Court of Appeal and told me to pick [Amber] up from [Ms.] Jones, which I did." Indeed, Ms. Hand's declaration of July 7 states that, on the afternoon of June 19 (when we issued our stay order), "John McCauley telephoned to inform me that the Court of Appeal had granted a stay order of which he was faxing me a copy to serve on [Ms.] Jones, and that I should pick up Amber at the day care center right away, to keep Ms. Jones from going to Texas. [¶] I spoke to Angela Parks-Pyles, the supervising CSW on duty, who concurred that I should pick up Amber right away and release her to Melissia Groomes. Ms. Parks-Pyles . . . instructed me to telephone the day care provider and caution her not to release Amber to Ms. Jones until I arrived."

take a vacation out of state in child-appropriate, sensitive language is disturbing to this court. Now, since Ms. Jones is not going on vacation until July 15th, the child shall continue to reside with . . . Ms. Jones until Ms. Jones goes on vacation."

In response, Mr. McCauley suggested that Ms. Jones was playing games (he offered no factual basis for this statement or for his suggestion that, had the Department not taken Amber away from her, Ms. Jones would have violated our stay order) and he also suggested that the juvenile court had no jurisdiction to do what it was doing. The court had the last word, suggesting again that the Department was acting in a disturbing fashion by relying on Ms. Groomes's hearsay statements and concluding with the following comment: "Now, all of the prior reports indicate that [Amber] has been well cared for by Ms. Jones. There is no evidence whatsoever that she has ever attempted, nor an indication that she might attempt to flee this jurisdiction, to not follow court orders . . . ."

### G.

Later that day (June 21), Mr. Hudgens delivered a letter to us explaining that, upon receipt of our stay order and *on the advice of the Department*, Ms. Groomes "immediately took custody of [Amber]." According to Mr. Hudgens's indignant version of what had transpired, the juvenile court had then "entertain[ed] a 'walk-on' (short-notice) item presented by [Ms. Robinson and Ms. Guy], over our objection" and had "ordered custody of [Amber] returned to [Ms. Jones] immediately. *[Ms. Groomes], whose declaration i[s] filed with this letter, has said she will resist compliance with today's order.*

"To spare [Amber] the distress of becoming the object of a judicial and famila [*sic*] 'tug-of-war,' we urge that your Honorable Court modify its June 19th order by adding the following: [¶] 'Meliss[i]a [Groomes] shall have custody of [Amber] until further order of this court. [Ms. Jones] shall file with this court her declaration under penalty of perjury as to whether she is going out of state between now and October 1, 1995, and if so, when and for how long.' " (Italics added.)

In a declaration accompanying Mr. Hudgens's letter, Mr. McCauley told us he "strenuously objected" to the matter being heard by the juvenile court while "the Court of Appeal had the matter under consideration." In her declaration, Ms. Groomes explained that she had told Ms. Hand that Ms. Jones planned to leave the state on June 20; that, contrary to the in-court representations by the mother's attorney, Amber's mother was "not in favor" of Amber staying in Texas for four to five weeks; and that, *"[o]n the evening*

of Monday, June 19, 1995, social worker Kate Hand received the stay order from the Court of Appeal and told me to pick [Amber] *up from* [Ms.] *Jones, which I did."* (Italics added.)

### H.

On June 21, we responded with the following order: "The prior order of this court, filed June 19, 1995, stayed only that May 30, 1995 order of the juvenile court permitting [Ms. Jones], the caretaker of [Amber], to take the minor out of the State of California and leave her with an unrelated caretaker in the State of Texas. The order did not contemplate or allow custody of the minor to be changed in any way. Therefore, [the] Los Angeles County Department of Children and Family Services is hereby ordered to *immediately* return . . . [Amber] to the custody of [Ms. Jones], by tonight if possible, and if not possible, then no later than noon on June 22, 1995."

### I.

On June 23, Ms. Robinson filed Amber's formal opposition to the Department's petition. After summarizing the proceedings and explaining her belief that Ms. Jones was providing Amber with "a wonderful summer full of learning opportunities," Ms. Robinson suggested the Department had acted in bad faith and without regard to Amber's well being in its handling of this entire matter. Elaborating on what happened after we issued our stay, Ms. Robinson explained that when Ms. Hand and Ms. Groomes went to take Amber from her day care provider and served a copy of our order on Ms. Jones, Ms. Jones suggested our order merely meant what it said. Ms. Hand's response was that she had the "power" to take the child from Ms. Jones's custody any time she wanted and to place her anywhere she chose. When Ms. Jones said she would cancel her trip, Ms. Hand nevertheless "took the child crying and screaming" from Ms. Jones and placed her with Ms. Groomes.

In an accompanying declaration, Ms. Robinson explained that, as Amber's attorney, she believed the planned vacation was in the child's best interests. She also explained that, as a result of these events and her contact with Ms. Groomes, she had "grave concerns over whether [Ms. Groomes] is an appropriate caretaker for this or any other child under the jurisdiction of this court. Ms. Groomes in speaking to me was literally hysterical, screaming at me over the telephone and hollering at me without ever being able to calmly discuss the matter at hand. . . . I am concerned that Ms. Groom[e]s may, in fact, not be emotionally stable or that her inappropriate behavior may be chemically induced. . . ."

### J.

On June 23, Mr. Hudgens submitted Ms. Hand's declaration. According to Ms. Hand, when she received our stay order on June 19, she and Ms.

Groomes went to Amber's day care provider. Upon their arrival, Ms. Hand showed Ms. Jones the order and suggested they talk. According to Ms. Hand, Ms. Jones refused, took Amber by the hand and said, "you're coming with me." When Amber began to cry, Ms. Hand concluded the child was in pain "and likely to leave the state with Ms. Jones the very next morning." Accordingly, she stepped between Ms. Jones and Amber, "released [Amber] from Ms. Jones' grasp and told Ms. Jones that Amber would be staying with [Ms.] Groom[e]s until she returned from Texas."

### K.

On June 23, we vacated our temporary stay order and denied the Department's petition. We also issued an order to show cause to the Department and County Counsel, directing them to appear and show cause regarding (1) whether there was *anything* in our stay order to support the decision to take the child from Ms. Jones and place her with Ms. Groomes or anyone else; (2) whether the Department and its attorneys acted in bad faith, for improper purposes, and/or with deliberate disregard of our express orders; and (3) whether monetary or other sanctions should be imposed on the Department and its attorneys or either of them. We specifically ordered that Mr. McCauley, Mr. Hudgens and Ms. Hand appear before us on July 25.

### L.

On July 10, the Department and County Counsel filed a written response to our OSC, contending they did not violate our stay order; that the "stay order made no specification as to custody, but was very explicit that [Amber] was not to be taken to Texas and left in the care of an unrelated caretaker there." Having unilaterally concluded that Ms. Jones could not be trusted "either to remain in California or to keep [Amber] in her care while in Texas" (rather than leaving her with Mr. Coleman), and based on the "scene" at the day care center, County Counsel and the Department decided they had inherent jurisdiction to protect the minor and take custody from Ms. Jones. Of course, this scenario conveniently ignores the fact that, by having Ms. Groomes drive to the day care center in her own car, Ms. Hand revealed her plan to take custody of the child no matter what Ms. Jones might have said or done.

Although there is nothing in the record other than Ms. Groomes's statement about what Ms. Jones supposedly told her (that she might leave on June 20),[9] the Department and County Counsel concluded that Ms. Jones was a flight risk because (1) as of July 5 (that is, *after* we dissolved our stay order and denied the petition), Ms. Jones's voice mail message at work said

---

[9] It is uncontroverted that no one from the Department or County Counsel's office ever attempted to call Ms. Jones or Ms. Robinson to inquire about the actual date of Ms. Jones's planned departure.

she would be "on vacation" from June 29 to July 7; and (2) Amber's day care provider told Ms. Hand she had not seen Amber since June 27 and did not expect her to return until September. Of course, none of this has anything to do with the Department's purported belief, on June 19, that Ms. Jones would violate our stay and leave on June 20. Nevertheless, we are told these "facts" made it "reasonable to infer that Ms. Jones [had] already left for Texas earlier than she had represented to the juvenile court through the minor's counsel, as she has not mentioned going anywhere else." The Department has not explained why it was that, after we vacated our stay and denied the petition, Ms. Jones should not have gone ahead with her original plans.

Instead, it simply suggests Ms. Jones could not be "trusted" because, "[d]espite all attempts of [the Department's] personnel to dissuade her from leaving [Amber] with Earl Coleman, and to explain the illegality of doing so, Ms. Jones had consistently stated she would leave [Amber] with [Mr.] Coleman while transacting her business. . . . Transferring [Amber] to Ms. Groom[e]s' custody, therefore, seemed the surest way of making certain that [Amber] was not taken to Texas and left with an unrelated caretaker there." In other words, Ms. Jones's efforts to obtain permission from the juvenile court to do what it (and we) believe she had every right to do means she couldn't be trusted and provides good cause for the Department and County Counsel to ask us for relief and, when it is denied, to go ahead and do what they want without regard to what any court might have to say about it.

Mr. Hudgens's declaration concedes there "was no mention [in the stay order] as to who was to have custody of [Amber]," but insists there was "no doubt" in his mind "that the intent of the order was to keep the child in the state, and that the only sure means of doing so on such short notice was to have DCFS transfer [Amber] to Ms. Groom[e]s' custody before Ms. Jones left the state with [Amber] on June 20, 1995. . . . I, therefore, told Mr. McCauley to telephone DCFS immediately from the building in which the Court of Appeal is located, to advise them to transfer [Amber] to Ms. Groom[e]s' custody that day." In other words, the change in placement was Mr. Hudgens's idea, not the Department's, as previously suggested by Mr. Hudgens. (See pt. G, ante.)

When the juvenile court ordered Amber returned to Ms. Jones, Mr. Hudgens tells us he "returned to the Court of Appeal reasonably confident that Division One would regard the trial court's latest order as a[n] usurpation of appellate writ jurisdiction, and would modify its June 19 order to specify that custody of [Amber] remain with Ms. Groom[e]s until it was satisfied that Ms. Jones was not planning to take [Amber] to Texas. I was surprised when Division One refused to modify the June 19 order; and

perplexed when their clerk told me verbally that the justices were very upset by the transfer of [Amber's] custody, and insisted that the child be restored to Ms. Jones's custody immediately . . . ."

DISCUSSION

In our view, the facts speak for themselves and there are only a few things left to be said.

First, we are dismayed and discouraged by this view of the system's response to a responsible foster parent's voluntary attempts to comply with the Department's rules and regulations. As noted at the outset, we do not share the Department's notion that leaving Amber with Mr. Coleman for a few weeks constitutes a "placement" within the meaning of the governing statutes. In spite of that fact, we can understand the Department's concern about out-of-state trips by dependent children and the need for special care when such a trip is contemplated. What we can't understand is the refusal to view this case (or any case) on its merits. While Ms. Hand may be over-worked, that is no excuse for her stubborn refusal to consider Ms. Jones's request simply because of "Department policy." In our view, Ms. Hand seems to have forgotten that she is charged with protecting Amber's best interests, not with maintaining the Department's right to intimidate foster parents (and punish those who have the temerity to resist intimidation).[10]

Second, we are equally dismayed by County Counsel's conduct. Mr. Hudgens and Mr. McCauley regularly file petitions in our court. Sometimes we give them all that they ask for, sometimes part of what they want, and other times we deny their requests altogether. In the past, they have always understood the letter and the spirit of our stay orders and they have always been able to distinguish between orders granting affirmative relief and simple stay orders. For these reasons, we simply cannot accept their asser-tion that they "misunderstood" the intent of our June 19 stay order.[11]

Third, we are not impressed with the conflicting declarations filed by Ms. Hand, Mr. Hudgens and Mr. McCauley. First, they insisted they took Amber

---

[10]In her declaration filed in opposition to our OSC, Ms. Hand claims there was not enough time between Ms. Jones's first call (in March) and her planned departure date (late June) to check out Mr. Coleman's qualifications. Of course, this doesn't explain Ms. Hand's unwill-ingness to accept the juvenile court's view of the trip as a vacation and not a "placement," nor does it explain Ms. Hand's conduct after we refused to issue an order transferring Amber's custody to Ms. Groomes. It is also inconsistent with Mr. McCauley's representation to the juvenile court that the reason Ms. Hand did not investigate Mr. Coleman was because Ms. Jones failed to provide the required information. (See also fn. 5, *ante.*)

[11]If Mr. Hudgens is as obtuse as his declaration would have us believe, he has no business representing a Department entrusted with the care of minors. He states: "Although there was no mention [in the stay order] as to who was to have custody of [Amber], I had no doubt that the intent of the order was to keep the child in the state, and that the only sure means of doing

from Ms. Jones on June 19 solely because Ms. Jones refused to sit down and talk to Ms. Hand. Later, after it became obvious that their request to Ms. Groomes to meet Ms. Hand at the day care center defeated a claim of a last-minute decision, they changed their story and told us they misconstrued our order and asked us to accept their representation that, based on information acquired in *early July*, they decided on *June 19* that Ms. Jones couldn't be trusted. Other inconsistencies are noted throughout this opinion and need not be repeated here.

Fourth, the Department and its attorneys seem to have forgotten that Amber is represented by Ms. Robinson. Ms. Robinson presented Ms. Jones's application to the court in the first instance because Ms. Robinson thought the planned trip was in Amber's best interests (and, of course, because Ms. Jones was not at that time represented by her own attorney and needed help with her efforts to question the Department's arbitrary denial of her request). The Department and its attorneys nevertheless took Amber from Ms. Jones without ever bothering to tell Ms. Robinson, who found out what had happened on June 20 when she called Ms. Jones to tell her the stay had been issued. Had the Department and its lawyers been acting in good faith and with Amber's best interests in mind, it is inconceivable that they would have taken the steps they did without notifying Amber's court-appointed representative.

We are satisfied beyond any doubt that Ms. Hand, Mr. Hudgens and Mr. McCauley acted without regard to Amber's best interests, in bad faith and for an improper purpose—to punish Ms. Jones for daring to question the Department's decision, to show the juvenile court that it was a waste of time to order anything that the Department, in its unilateral and unrestricted view, did not approve and, finally, to let us know that they were equally unimpressed with our orders. If ever a case cried out for the imposition of sanctions, this is it. (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637 [183 Cal.Rptr. 508, 646 P.2d 179]; *Manzetti* v. *Superior Court* (1993) 21 Cal.App.4th 373, 375, 381-382 [25 Cal.Rptr.2d 857]; *City of Bell Gardens* v. *County of Los Angeles* (1991) 231 Cal.App.3d 1563, 1570-1574 [283 Cal.Rptr. 91]; *Lawrence* v. *Superior Court* (1988) 206 Cal.App.3d 611, 619 [253 Cal.Rptr. 748].)

---

so on such short notice was to have DCFS transfer [Amber] to Ms. Groom[e]s' custody before Ms. Jones left the state with [Amber] on June 20, 1995. Judging by the speed with which it acted and its history of granting relief in dependency emergencies, I anticipated that Division One would be unhappy with County Counsel and DCFS if we allowed [Amber] to leave California and something bad happened to her in Texas." In our view, Mr. Hudgens and Mr. McCauley and their client were not about to let us interfere with their efforts to punish Ms. Jones for her refusal to accept their word as final on the subject of her trip. And, of course, we believe Mr. Hudgens, Mr. McCauley, Ms. Hand and Ms. Hand's supervisors were all so involved in this power play that they completely forgot about Amber.

We see no purpose in having the County pay money to itself which, as a practical matter, would be the result of ordering reimbursement for the attorney fees incurred by Ms. Robinson and Susan Crane (the attorney now representing Ms. Jones) since both attorneys are paid by the County in the first instance. However, we do believe that Ms. Jones is entitled to full reimbursement for the expenses she incurred when she had to change her travel plans without prior notice, a total of $1,500. That amount is to be paid to Ms. Jones, one-third each by Ms. Hand, Mr. McCauley and Mr. Hudgens.[12]

In addition, we believe this is an appropriate case for the imposition of sanctions payable to the Court of Appeal. (See *Manzetti* v. *Superior Court*, *supra*, 21 Cal.App.4th at pp. 375, 381-382; *Young* v. *Rosenthal* (1989) 212 Cal.App.3d 96, 135-137 [260 Cal.Rptr. 369].) Accordingly, Ms. Hand, Mr. Hudgens and Mr. McCauley are each ordered to pay $1,000 to the Clerk of the Court of Appeal as sanctions for a frivolous writ petition (a total of $3,000).

### DISPOSITION

Ms. Hand, Mr. Hudgens and Mr. McCauley shall, within five days, deliver to Ms. Crane cashier's checks in the amount of $500 each, all payable to Ms. Jones (a total of $1,500). Within the same time, cashiers' checks in the amount of $1,000 each, all payable to the Clerk of the Court of Appeal, shall be delivered to the Clerk of this court by Ms. Hand, Mr. Hudgens and Mr. McCauley (a total of $3,000). This order is immediately final. The clerk of this court is directed to mail a copy of this opinion to the Los Angeles Office of the State Bar of California, to the attention of the Chief Trial Counsel.

Ortega, Acting P. J., and Masterson, J., concurred.

Petitioner's application for review by the Supreme Court was denied October 26, 1995.

---

[12]We express no opinion on whether they should be reimbursed by their respective employers.