[No. H013679. Sixth Dist. Dec. 1, 1995.]

In re JOHNNY S., a Person Coming Under the Juvenile Court Law.
SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND
CHILDREN'S SERVICES, Plaintiff and Respondent, v.
YVONNE Q., Defendant and Appellant.

In re GENEVA R., a Person Coming Under the Juvenile Court Law.
SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND
CHILDREN'S SERVICES, Plaintiff and Respondent, v.
YVONNE Q., Defendant and Appellant.

**COUNSEL**

Mary Willans-Izett, under appointment by the Court of Appeal, for Defendant and Appellant.

Steven M. Woodside, County Counsel, and Jan E. Burland, Deputy County Counsel, for Plaintiff and Respondent.

Catherine C. Czar, under appointment by the Court of Appeal, George Kennedy, District Attorney, and Robert J. Masterson, Deputy District Attorney, for Minors.

Catherine Campbell, under appointment by the Court of Appeal, for Minors' father.

## OPINION

**COTTLE, P. J.**—The mother of Johnny S. and Geneva R. contends that the juvenile court erred in placing the children with their father in Texas without complying with the provisions of the Interstate Compact on Placement of Children (ICPC) (Fam. Code, § 7900 et seq.). We hold that compliance with the ICPC is not mandatory when a California court places a child with a parent residing in another state. We therefore affirm the juvenile court's jurisdictional findings, dispositional orders and judgments regarding Johnny S. and Geneva R.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Yvonne Q. (mother) is the mother of seven children, two of whom are involved in this appeal. Her contact with the juvenile court began in 1986, when she was convicted of child endangerment and substance abuse. Her two older children were made dependents of the court in 1987 due to mother's drug usage and neglect of the children. Mother also has a history of psychiatric problems, including hospitalizations and suicide attempts. In late 1993, her child Richard R. was hospitalized and made a dependent of the court because of serious emotional damage. Mother attempted suicide with a knife in October 1994, and police reports of the incident stated that the home was unfit for children.

On or about November 16, 1994, a petition was filed on behalf of Johnny S. (born January 2, 1990), pursuant to Welfare and Institutions Code section 300, subdivision (b). As amended on December 1, 1994, the petition alleged that Johnny had tested positive for cocaine at birth, and that his mother's criminal record reveals convictions for willful child cruelty and failure to report to a work release program and arrests for other offenses. The petition alleged that mother had a history of psychiatric hospitalizations, and that Johnny and three siblings were placed in protective custody in 1993 because

his mother took an overdose of codeine pills. The petition alleged that Johnny's three older half siblings were made dependent children of the court due to the mother's problems, and that Johnny's mother threatened to remove Johnny from the relative with whom he had been left. At the same time, a petition was filed pursuant to Welfare and Institutions Code section 300, subdivision (j), alleging that Johnny's siblings had been abused or neglected, and that there was a substantial risk that Johnny would be abused or neglected.[1]

Similar petitions were filed on behalf of Johnny's sister, Geneva R., who was born on June 8, 1988. Geneva's petitions also alleged that she came within the provisions of Welfare and Institutions Code section 300, subdivision (d) in that she had been sexually molested during the summer of 1994 by her 13-year-old brother, Richard R. (who admitted he had inappropriately touched her on 2 occasions) and had been molested earlier by her father's cousin. Petitions were also filed on behalf of two other siblings, Matthew A. and Christopher Q., but these cases are not part of this appeal.

The social worker with the department of family and children's services (DFCS) prepared an initial report in November 1994. At the time of this report, Johnny was living with a second cousin, and Geneva was living with her grandmother. The report recommended removal of Johnny and Geneva from their parents, placement of Johnny with the second cousin who was caring for him, and placement of Geneva with her grandmother. The report stated, however, that their father had expressed a sincere interest in gaining custody of the children.

Later in November 1994, Johnny and Geneva's father, Juan R., and his wife, Anna, sent a detailed letter to the social worker explaining their commitment to the children. The letter stated that they had been unable to develop a significant relationship with the children due to distance and the mother's hostile attitude. In addition, their family finances precluded regular visits to California. They stated that they both had "good dependable jobs and a home for both Johnny and Geneva with lots of love for them." Although Juan R. had "a past history with alcohol," he had been sober for the last nine months, and was willing to attend Alcoholics Anonymous or do whatever was required by the court. They had recently spoken with both children with permission from the children's caretakers. They had also

---

[1]The petition alleged that Johnny's half siblings, Monique and Jenny Q., had been made dependent children of the court in 1987, after mother left them in the care of their grandmother without providing for their care, and refused to apprise the grandmother of her whereabouts. Johnny's half sibling, Christopher Q., and his two sisters were placed in protective custody in 1994 when mother attempted suicide with a knife, the home was observed to be unfit, and their father was arrested for a parole violation.

contacted a family counselor, and were willing to arrange counseling meetings for Geneva and for the family.

On or about February 1, 1995, the social worker received a home study from Texas social services. The Texas report stated that Juan R. and Anna were "interested and willing to have these two children placed in their home." The study confirmed that both Juan R. and his wife had steady employment. They were caring for three children from Anna's prior marriage. Although Juan R. previously had an alcohol problem, he had sought treatment, and intended to continue to work with a support group to remain sober. He had a criminal history in his youth, but no recent criminal history. Both Juan R. and his wife were committed to providing a home for Johnny and Geneva. They were engaged in parent education classes, and had made the necessary arrangements for child care. They were genuinely concerned about the problems that Johnny and Geneva had suffered, and wanted to give the children a stable home life and be "one big happy family."

At a settlement conference held on February 2, 1995, the court found that Juan R. was the father of Johnny S. and Geneva R., subject to the filing of a declaration of paternity by Juan R. The declaration was filed on February 9, 1995.

Both jurisdiction and disposition were tried on February 9, 1995. Juan R. and his wife, Anna, were personally present at the trial. After a minor amendment to the petitions,[2] the court received the social worker's original report, addendum and attachments into evidence, and took judicial notice of "all findings and orders that the law permits me to take judicial notice of regarding both Geneva and Johnny." The court found the allegations of the amended petitions true, and adjudged the children dependents of the court.

Regarding disposition, mother testified that Juan R. had an alcohol problem when she lived with him in Texas. She testified about problems Juan R. had when she had lived with him, and stated that Juan R. had damaged his son, Richard R., and that she was worried that he might not be a good father to Johnny and Geneva. She testified: "I'm not saying that he won't be a good parent. I just don't know if he's had to change his ways."

After the dispositional evidence, DFCS recommended removal of Johnny and Geneva from their mother and placement with Juan R. at his home in Texas. DFCS recommended that no reunification services be provided to mother, but that she be permitted some visitation. The court adopted these

---

[2]The petitions were amended to state that the father Juan R. had had minimal contact with the children, rather than none.

recommendations, and placed the children with their father, with family maintenance services to be provided. The court found by clear and convincing evidence that the welfare of the children required that they be taken from their mother, that the father was able and willing to assume their custody, and that placement with the father would not be detrimental. The matter was continued for a six-month review hearing on July 25, 1995.

The parties discussed when the children should go to Texas. During that discussion, the social worker expressed concern regarding whether Texas would provide courtesy supervision, and whether the placement needed to be pursuant to the ICPC. DFCS counsel stated that the ICPC was not applicable to a parental placement. After the discussion, the trial court decided that the children should fly with Juan R. and Anna when they returned to Texas shortly after the hearing.

On or about February 14, 1995, the mother filed a notice of appeal regarding the trial court's orders. The trial court's formal jurisdictional findings and dispositional orders and judgments regarding Johnny and Geneva were signed on February 28, 1995. These materials have been made part of the record on appeal, and we treat mother's notice of appeal as if it had been filed immediately after the judgments were entered.[3]

## II. Discussion

On appeal, mother contends that the trial court erred in sending Johnny and Geneva to Texas without full compliance with the ICPC. DFCS, father and the children contend that the ICPC does not apply to this case, that the trial court correctly sent the children to Texas with their father without full compliance with the ICPC, and that the trial court's orders and judgments should be affirmed.

### A. The ICPC

Both California and Texas have signed the ICPC and enacted statutes codifying its provisions. (See Fam. Code, § 7900 et seq.; Vernon's Tex. Hum. Res. Code Ann., § 45.021 et seq.)  The purpose of the ICPC is to facilitate cooperation between participating states in the placement and

---

[3]Rule 2(c) of the California Rules of Court provides in part: "A notice of appeal filed prior to rendition of the judgment, but after the judge has announced his intended ruling, may, in the discretion of the reviewing court for good cause, be treated as filed immediately after entry of the judgment."

monitoring of dependent children.[4] (*Tara S.* v. *Superior Court* (1993) 13 Cal.App.4th 1834, 1837 [17 Cal.Rptr.2d 315].) Article 2 defines "Placement" as "the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution but does not include any institution caring for the mentally ill, mentally defective or epileptic or any institution primarily educational in character, and any hospital or other medical facility." (Fam. Code, § 7901, art. 2, subd. (d).)

Article 3 of the ICPC provides "Conditions for Placement," including the following: "No sending agency shall send, bring, or cause to be sent or brought into any other party state any child *for placement in foster care or as a preliminary to a possible adoption* unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state governing the placement of children therein." (Fam. Code, § 7901, art. 3, subd. (a), italics added.) Article 3 requires the sending agency to "furnish the appropriate public authorities in the receiving state written notice of the intention to send, bring, or place the child in the receiving state" (Fam. Code, § 7901, art. 3, subd. (b)), and mandates that the child shall not be sent into the receiving state "until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." (Fam. Code, § 7901, art. 3, subd. (d).)

Article 5 of the ICPC requires the sending agency to retain jurisdiction over the child "until the child is adopted, reaches majority, becomes self-supporting, or is discharged with the concurrence of the appropriate authority in the receiving state." The sending agency "shall continue to have financial responsibility for support and maintenance of the child during the period of the placement." (Fam. Code, § 7901, art. 5, subd. (a).) Article 5 also provides that "[w]hen the sending agency is a public agency, it *may* enter into an agreement with an authorized public or private agency in the receiving state providing for the performance of one or more services in

---

[4]Article 1 of the ICPC states the ICPC's purpose as follows: "It is the purpose and policy of the party states to cooperate with each other in the interstate placement of children to the end that: [¶] (a) Each child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care. [¶] (b) The appropriate authorities in a state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements for the protection of the child. [¶] (c) The proper authorities of the state from which the placement is made may obtain the most complete information on the basis on which to evaluate a projected placement before it is made. [¶] (d) Appropriate jurisdictional arrangements for the care of children will be promoted." (Fam. Code, § 7901, art. 1.)

respect of that case by the latter as agent for the sending agency." (Fam. Code, § 7901, art. 5, subd. (b), italics added.) Other provisions of the ICPC deal with definitions, penalties, institutional care of delinquent children, limitations, and severability.

### B. *Application of the ICPC to Placement With Parent*

The crucial question is whether the ICPC applies when a court in this state directs that a child be sent to a natural parent in another participating state. The Fourth District Court of Appeal recently considered a similar question in *Tara S. v. Superior Court, supra,* 13 Cal.App.4th 1834. The petition in that case alleged that the child was at risk of physical and sexual abuse due to her mother's substance abuse. The child was placed in a confidential foster home. (*Id.* at p. 1837.) The father came from Minnesota and requested custody of the child and dismissal of the action. (*Ibid.*) The juvenile court declined to dismiss dependency, but ordered that the child be detained with her father at his home in Minnesota. (*Ibid.*)

The mother sought writ relief from the detentional orders releasing the child to the father, based on the juvenile court's noncompliance with the ICPC. (*Tara S. v. Superior Court, supra,* 13 Cal.App.4th at p. 1837.) The mother relied upon a 1978 California Attorney General opinion stating that "[e]xcept for the prior notice provisions in article 3 of the Compact, the Compact applies when the juvenile court places a child with a parent in another Compact state." (61 Ops.Cal.Atty.Gen. 535, 537 (1978).) The Attorney General opinion interprets the ICPC's definition of " 'placement,' " and concludes that since there is nothing in the term " 'family free . . . home' " to limit it to any particular home, the term "would appear broad enough to include the home of a mother or father of the child." (61 Ops.Cal.Atty.Gen., *supra,* at p. 539.) The *Tara S.* court stated: "We disagree. Such an interpretation does not make sense in light of article 3 which limits the ICPC to foster care and possible adoption—neither of which would involve natural parents." (13 Cal.App.4th at p. 1837.) The court therefore held that the trial court did not err in permitting the minor to be detained with her father pending future jurisdictional and dispositional hearings without invoking the ICPC. (*Id.* at p. 1838.) The court denied the mother's writ petition. (*Id.* at pp. 1838-1839.)

The federal court in *McComb v. Wambaugh* (3d Cir. 1991) 934 F.2d 474 also considered this issue.[5] In a detailed opinion, the *McComb* court examined the history of interstate compacts, the interrelationship between compacts and state statutes, the purpose and legislative history of the ICPC, and

---

[5]In *McComb*, a child sued Pennsylvania authorities for damages allegedly suffered because of their failure to protect him from his mother. The child had been made a dependent of one

the construction of the ICPC by the compact administrators who are responsible for implementing it. After analyzing these factors, the *McComb* court stated: "We are persuaded that read as a whole the Compact was intended only to govern placing children in substitute arrangements for parental care. Thus, the Compact does not apply when a child is returned by the sending state to a natural parent residing in another state. The language of Article III is unambiguous and, as noted earlier, Article V's requirement that the sending state continues to be financially responsible is inconsistent with the primary obligation of parents." (934 F.2d at 482.)

In this case, mother concedes that the requirements of article 3 of the ICPC are specifically limited to situations in which the proposed placement is "in foster care or as a preliminary to a possible adoption . . . ." (Fam. Code, § 7901, art. 3, subds. (a), (b).) The conditions of article 3, such as advance notice to and approval of the receiving state before the placement is made, clearly do not apply when the child is placed with a parent. Article 5, which requires continuation of the sending state's financial responsibility for the child and retention of jurisdiction, does not state a specific limitation to foster care and preadoptive placements. We believe that article 5's provisions, however, like the provisions of article 3, are part of the ICPC's overall design to protect children in placements that are substitutes for parental care. In the case of a parent, who has a duty to support the child, article 5's provision that the sending state "continue to have financial responsibility for support and maintenance of the child during the period of the placement" is unnecessary. Like the court in *Tara S.*, we are persuaded that the ICPC is intended to apply only to interstate placements for foster care and preliminary to a possible adoption, and not to placements with a parent.

Mother contends that because she seeks relief from a dispositional order, the analysis in *Tara S.* (which involved an order detaining the child with the child's father in another state *pending* a hearing on jurisdiction and disposition) should not apply. We recognize that we are not bound by the holding in *Tara S.* (see *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]), and that the *Tara S.* case arose in a different procedural context. Reading the ICPC as a whole, however, we are convinced that the ICPC was not intended to apply to placement with a parent.

---

state (Virginia), placed by the Virginia court with his mother in another state (Pennsylvania) without the ICPC process, and thereafter had suffered serious physical injury at the hands of his mother. The court held that the ICPC did not govern the Virginia court's placement of the child with the mother in Pennsylvania, and therefore no special relationship existed between the child and the Pennsylvania authorities. The court therefore affirmed the trial court's summary judgment in favor of the Pennsylvania authorities.

Mother's argument that the ICPC applies to parental placements is based in part on regulations contained in the Child Welfare Services Program Manual of Policies and Procedures, promulgated by the California Health and Welfare Agency. Section 31-510 of these regulations states that the ICPC "shall be applicable between member states under any of the following circumstances: [¶] .11 When an agency or court in a member state, the sending agency, wishes to place a child, for whom it holds legal custody or placement responsibility, in another member state and in a: [¶] . . . [¶] .113 Relative's home, including the home of a parent." These regulations also state that the California sending agency shall not send a child out of state until its ICPC request has been approved in writing and a home study has been received from the appropriate public authority in the receiving state. (§ 31-510.33.)

These regulations were promulgated by an executive agency pursuant to its rulemaking authority. To the extent that regulations conflict with statutes or decisional law, the law controls the regulations. (*Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 425-426 [128 Cal.Rptr. 183, 546 P.2d 687].) The ICPC article 3 requirement of advance approval from the receiving state for a placement is clearly limited to cases of placement "in foster care or as a preliminary to a possible adoption . . . ." (Fam. Code, § 7901, art. 3, subd. (b).) Regulations requiring such advance approval for placement with a parent are neither binding nor persuasive in light of the limitations expressed in the statute itself.

The *McComb* court addressed a similar interpretation adopted by the Association of Administrators of the Compact.[6] The court stated that " '[a] regulation cannot be upheld if it is contrary to the statute under which it was promulgated,' " and disregarded the regulation. (934 F.2d at 481.)

Mother also argues that because father must comply with numerous orders, his compliance must be monitored, and "[t]here is no way of monitoring a child, home, parent, or situation in another state except under the ICPC." She contends that a Texas social worker is necessary to monitor father's required participation in Alcoholics Anonymous, parenting classes, family counseling, counseling of the child, and to ensure that he refrains from the use of physical punishment, alcohol, or drugs. DFCS argues that its

---

[6]The *McComb* court noted that the Association of Administrators of the Compact had adopted regulations which defined "placement" to include a situation in which a court as the sending agency arranges for a parent in another state to care for a child. (934 F.2d at 481.) In addition, the secretariat of the association had issued opinion letters to that effect. (See Compact Administrator's Manual, at 3.61 [cases involving placement of a child in the home of a biological parent "were clearly intended to receive the protections of the Compact, including investigation before placement is made"], 3.87, 3.97.)

supervision "can be conducted by correspondence, electronic mail, facsimile and telephone. The family maintenance orders established with respect to [Juan R.'s family] do not need the involvement of a Texas social worker; DFCS can monitor the case from California."

On the record before us, especially in light of Juan R.'s request for custody and his agreement to the court orders, there is no evidence that the situation cannot be monitored by DFCS from California. If DFCS determines that monitoring by an agency in Texas is needed, it may choose to enter into an agreement for such services. Article 5, subdivision (b) of the ICPC provides: "When the sending agency is a public agency, it may enter into an agreement with an authorized public or private agency in the receiving state providing for the performance of one or more services in respect of that case by the latter as agent for the sending agency." (Fam. Code, § 7901, art. 5, subd. (b).) Such agreements are consistent with section 7906 of the Family Code, which provides that "[a]ny requirements for visitation, inspection, or supervision of children, homes, institutions, or other agencies in another party state which may apply under the law of this state shall be deemed to be met if performed pursuant to an agreement entered into by appropriate officers or agencies of this state or a subdivision thereof as contemplated by paragraph (b) of Article 5 of the [ICPC]."

Under these sections, the California court's requirements *may* be met pursuant to an agreement between the California agency responsible for supervision and another agency in the receiving state. We do not discourage such voluntary agreements, which are clearly permitted and appropriate for many cases. We hold, however, that the provisions of the ICPC are not *mandatory* in connection with placement of a child with a natural parent in another state.

Our decision is consistent with the policy, expressed in Welfare and Institutions Code section 361.2, that when a court orders removal of a child from a parent to protect the child, the court must first consider placement with the other parent. Welfare and Institutions Code section 361.2, subdivisions (a) and (b) require placement with the previously noncustodial parent if the parent wishes such placement and if such placement would not be detrimental to the children. In this case, the court did not terminate jurisdiction, but ordered that "the parent assume custody subject to the supervision of the juvenile court," pursuant to subdivision (b)(2) of Welfare and Institutions Code section 361.2. The court thus exercised a supervisory or guidance role, not a custody role.

Finally, this is not a case in which a child is being sent to a home on the basis of inadequate information. Juan R. and Anna provided a detailed

statement of their circumstances, and Texas social services conducted a home study confirming the family's desire to have the children and the suitability of the placement. Juan R. and Anna were present at the dispositional hearing, and could have been cross-examined if anyone questioned their capacity to parent. The court's determinations that Juan R. was able and willing to assume custody of the children and that the children's placement with their father would not be detrimental are fully supported by the evidence.

## DISPOSITION

The jurisdictional findings and dispositional orders and judgment dated February 28, 1995, in the matter of Johnny S. (No. JD06170) are affirmed. The jurisdictional findings and dispositional orders and judgment dated February 28, 1995, in the matter of Geneva R. (No. JD06173) are affirmed.

Bamattre-Manoukian, J., and Wunderlich, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 15, 1996. Baxter, J., was of the opinion that the petition should be granted.