[No. A095992. First Dist., Div. Three. Dec. 11, 2001.]

In re EMMANUEL R., a Person Coming Under the Juvenile Court Law.
ALAMEDA COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Appellant, v.
BEATRICE R. et al., Defendants and Respondents.

454

**COUNSEL**

Richard E. Winnie, County Counsel, and Calvin C. James, Assistant County Counsel, for Plaintiff and Appellant.

Diane Bellas, Public Defender; Jennifer Turk and C. Joy Ricardo for Defendant and Responent Beatrice R.

Janet G. Sherwood, under appointment by the Court of Appeal, for Defendant and Respondent Elijah R.

Donna Furth, under appointment by the Court of Appeal, for Minor.

**OPINION**

**PARRILLI, J.**—This appeal raises an unsettled question under the Interstate Compact on Placement of Children (ICPC) (Fam. Code, § 7900 et seq.): Does the ICPC prevent a California court from ordering visitation between a dependent child and his noncustodial parent where a previous ICPC evaluation found the parent's home unsuitable for placement? Under the circumstances of this case, we conclude it does not.

The Alameda County Social Services Agency (Agency) successfully petitioned this court for a stay of a juvenile court order allowing respondent Emmanuel R. to visit his father's home in Florida for 10 days at the end of August, during Christmas holidays, and for four weeks during summer 2002. We issued a writ of supersedeas and ordered expedited briefing of the appeal. We conclude the ICPC does not bar court-approved visitation with a

parent, and the juvenile court did not abuse its discretion in finding that the visits were in Emmanuel's best interest; therefore we affirm the visitation order.

## BACKGROUND

Twelve-year-old Emmanuel R. and his brother Gabriel live with their mother, Beatrice R., in Oakland, California. In November 1998, the Agency filed a petition under Welfare and Institutions Code section 300 based on the mother's alcohol abuse and Emmanuel and Gabriel were temporarily detained, first in foster care and then with their mother in a residential treatment program. At the dispositional hearing, the juvenile court declared Emmanuel and Gabriel dependents of the court and ordered their "CARE, CUSTODY, CONTROL and CONDUCT . . . [to] be under the supervision of the Social Services Agency," but permitted them to reside with their mother. Thereafter, the Agency has provided family maintenance services to the boys and their mother. (Welf. & Inst. Code, § 16506, subd. (a).) The boys' father, Elijah R., lives in Florida with his girlfriend Rebecca, their infant daughter, and Rebecca's son.

Although the Agency stated in each of its status review reports that it had not been in contact with Elijah, on April 11, 2000, the juvenile court granted Emmanuel's request to visit his father in Florida. A caseworker scheduled this visit to last from June 16 or 17 through August 2000. However, on June 8, the caseworker told Emmanuel's mother she had received a negative oral report about Elijah from Florida child welfare authorities, and so she planned to ask the court to reconsider the order authorizing Emmanuel's visit. Later that night, Elijah arrived in Oakland, and the mother allowed Emmanuel and Gabriel to return with him on a plane to Florida. She explained to the caseworker the following day that she believed it was in the children's best interests to visit their father. Unsuccessful in her attempts to contact Elijah, on June 12, 2000, the caseworker obtained an ex parte arrest warrant for Emmanuel and Gabriel and sought the aid of the Florida police and child welfare office in bringing the boys into protective custody. Florida authorities removed Emmanuel and Gabriel from their father's home nearly a month later, on July 5, 2000, and the Agency's caseworker flew to Florida and returned the boys to California on July 10, 2000. The children were placed in an emergency foster home on the night of their return and brought to a court hearing the following morning. At that hearing, the caseworker recommended that Emmanuel and Gabriel be removed from their mother and criminal charges be filed against both parents; however, the court ordered the boys returned to their mother's home.

At a review hearing on August 1, 2000, the juvenile court appointed counsel for Elijah and ordered that an ICPC study be undertaken for him.

The Agency then submitted "Interstate Compact Placement Request" forms with the Florida Department of Children and Families to assess the suitability of Elijah's home for placement of Emmanuel and Gabriel. Emmanuel expressed a desire to live with his father; however, Florida denied the ICPC placement request based on Elijah's "extensive criminal record" and past history with Florida child welfare authorities. When the Agency caseworker reported this result at a review hearing, the court directed her to resubmit the request and ask Florida to elaborate on the reasons for its denial. The caseworker agreed and suggested the court also "consider a visit of one or both of the children, say, during the summer . . . ." At the next review hearing, however, the Agency opposed Emmanuel's request to visit his father, contending that Florida's denial of the ICPC placement request indicated potential danger to Emmanuel during even a short visit. The court commissioner continued the hearing for one week, until June 19, 2001, to review the full ICPC report from Florida.

Elijah and Rebecca traveled by bus from Florida to attend the June 19 hearing. At this hearing, the commissioner heard extensive argument about the ICPC and Emmanuel's requested visit from counsel for the mother, father, Emmanuel and Gabriel (who had separate representation), and county counsel. Only county counsel opposed visitation. The commissioner concluded he had authority to order visitation despite the ICPC placement study and, finding visitation to be in the child's best interest, approved a 10-day visit for Emmanuel to begin immediately. County counsel obtained an immediate stay of the commissioner's order to seek rehearing. (Code Civ. Proc., § 917.7.)

Rehearing commenced before a superior court judge on July 26, 2001. After hearing testimony from the Agency's caseworker about the aborted June 2000 visit and argument about the applicability of the ICPC to Emmanuel's requested visit, the court took the matter under submission. On August 23, 2001, the court ruled that (1) under controlling California law, the ICPC does not apply to a minor's visit with a parent in another state; (2) the ICPC study assessing the suitability of Elijah's home for placement did not preclude a short-term visit; and (3) the visit was in Emmanuel's best interest. Accordingly, the court approved an immediate visit for Emmanuel in his father's home for the few remaining days of summer vacation (via air transportation to be paid by the Agency) and also approved "holiday visits" and a four-week visit in summer 2002. The court denied county counsel's motion to stay the visitation order, and county counsel immediately sought a stay from this court and petitioned for a writ of supersedeas. We issued a temporary stay of the August 23, 2001 order, granted the petition for writ of supersedeas, and ordered expedited briefing of the appeal.

## DISCUSSION

### I. *ICPC Does Not Apply to Court-approved Visitation in This Case*

█ The ICPC is an agreement among California and other states that governs "sending, bringing or causing any child to be sent or brought into a receiving state for placement in foster care or as a preliminary to a possible adoption . . . ." (Fam. Code, § 7901, art. 3, subd. (b).) "The purpose of the ICPC is to facilitate cooperation between participating states in the placement and monitoring of dependent children. (*Tara S.* v. *Superior Court* (1993) 13 Cal.App.4th 1834, 1837 [17 Cal.Rptr.2d 315].) Article 2 defines 'Placement' as 'the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution but does not include any institution caring for the mentally ill, mentally defective or epileptic or any institution primarily educational in character, and any hospital or other medical facility.' (Fam. Code, § 7901, art. 2, subd. (d).)" (*In re Johnny S.* (1995) 40 Cal.App.4th 969, 974-975 [47 Cal.Rptr.2d 94], fn. omitted.)

With regard to "Conditions for Placement," article 3 of the ICPC mandates: "No sending agency shall send, bring, or cause to be sent or brought into any other party state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state governing the placement of children therein." (Fam. Code, § 7901, art. 3, subd. (a).) Before any child can be sent or brought into a receiving state "for placement in foster care or as a preliminary to a possible adoption," the "sending agency" must give written notice to appropriate authorities in the receiving state (Fam. Code, § 7901, art. 3, subd. (b)), and authorities in the receiving state must confirm "that the proposed placement does not appear to be contrary to the interests of the child" (Fam. Code, § 7901, art. 3, subd. (d)).

█ In construing these provisions, California courts have concluded the ICPC does not apply to placements with a dependent child's natural parent. (*In re Johnny S., supra,* 40 Cal.App.4th at pp. 977-979; *Tara S.* v. *Superior Court, supra,* 13 Cal.App.4th at pp. 1837-1838.) In *Tara S.,* the Fourth District Court of Appeal rejected a broad interpretation of the term "family free . . . home" in the ICPC's definition of "placement" that would have encompassed placements in the home of a child's mother or father. (*Tara S.* v. *Superior Court, supra,* at pp. 1837-1838.) The Sixth District Court of Appeal agreed with this reasoning and concluded ICPC compliance is not mandatory for placement of a child in a parent's home because article 3 clearly limits the requirement of advance approval from an ICPC receiving

state to a "placement in foster care or as a preliminary to a possible adoption" (Fam. Code, § 7901, art. 3, subds. (a) & (b)). (*In re Johnny S.,* *supra,* at pp. 977-979.) Thus, under existing California case law, ICPC procedures simply are not required for a placement of Emmanuel with his father in Florida. If the ICPC does not apply to a parental placement, clearly it does not apply to a short-term visit with a parent.

The Agency argues these cases were wrongly decided, relying on contrary authority from other states (see *Arizona Dept. of Economic Sec. v. Leonardo* (2001) 200 Ariz. 74 [22 P.3d 513]; *Dept. of Children & Fam. v. Benway* (Fla.Dist.Ct.App. 1999) 745 So.2d 437), an implementing regulation adopted by the Association of Administrators of the Interstate Compact on the Placement of Children (AAICPC), and an opinion letter by the secretariat of this organization.[1] Regulation 3 states that the definition of "placement" in article 2 of the ICPC "includes the arrangement for the care of a child in the home of his parent . . . when the sending agency is any entity other than a parent, relative, guardian or non-agency guardian . . . ."[2] In the same vein, AAICPC Secretariat Opinion 32 states that an interstate placement is excluded from coverage under the ICPC only if parties on *both* the sending and receiving ends are exempt from the compact. Thus, where a welfare agency in State A placed children in agency custody with their father in State B, the secretariat concluded ICPC procedures should have been followed.

However, much as the Agency would like us to, we need not reexamine California case law regarding application of the ICPC to interstate placement with parents, because the juvenile court in this case did not order a "placement" but merely approved a series of short-term visits. ICPC procedures are not required for simple visits (i.e., visits ordered for their own sake and not as a prelude to placement). Moreover, we conclude the existence of a prior ICPC home study did not convert the court-approved visits in this case into a "placement" under the compact.

## A. Court-approved Visits Exempt from ICPC

By its own terms, the ICPC governs only the "placement" of dependent children across state lines; it does not apply to mere visits. AAICPC

---

[1] We granted the Agency's unopposed motion to augment the record on appeal and requests for judicial notice of materials pertaining to the ICPC. In addition, we now grant Emmanuel's request for judicial notice of AAICPC regulations 9 and 10, which the Agency failed to include with its submission.

[2] The Agency fails to mention that the Court of Appeal in *Johnny S.* expressly rejected a similar regulation promulgated by the California Health and Welfare Agency. Citing the rule that statutes and decisional law take precedence over conflicting regulations (*Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 425-426 [128 Cal.Rptr. 183, 546 P.2d 687]), the court concluded: "Regulations requiring such advance approval for placement with a parent are neither binding nor persuasive in light of the limitations expressed in the statute itself." (*In re Johnny S., supra,* 40 Cal.App.4th at p. 978.)

regulation 9 (regulation 9) draws a clear distinction between the two concepts: "A visit is not a placement within the meaning of the [ICPC]. Visits and placements are distinguished on the basis of purpose, duration, and the intention of the person or agency with responsibility for planning for the child as to the child's place of abode." Whereas a placement involves the assumption of presumably long-term child care responsibilities, regulation 9 states "[t]he purpose of a visit is to provide the child with a social or cultural experience of short duration, such as a stay in a camp or with a friend or relative who has not assumed legal responsibility for providing child care services." To further clarify the boundary between a placement and a visit, regulation 9 creates a presumption that a stay intended to last "no longer than thirty (30) days" will constitute a visit, but a stay of longer than 30 days will generally constitute a placement (except that longer visits coinciding with the beginning and end of a school vacation may be allowed). (See also Cal. Rules of Court, rule 1428 [an order sending a dependent child out of state for more than 30 days constitutes a placement].)

The only AAICPC secretariat opinion to squarely address the difference between visits and placements also stresses the significance of duration. Considering whether a parent may take a child who is in the custody of one state and bring that child into the parent's home state, Secretariat Opinion 12 observes that the need for ICPC compliance depends on the length of the child's stay with the parent: "If the visit is to be only a brief one and the agency having custody believes it to be safe and appropriate, the action might not constitute a 'placement' within the meaning of the [ICPC]. However, if the arrangement is to be for a significant period of time, it should be regarded as a placement."

It is clear from the record the juvenile court authorized only *visits* between Emmanuel and his father. Out of an abundance of caution, the court limited the longest of these visits to "no more than 4 weeks," i.e., less than the 30-day upper limit presumed for a visit in regulation 9. The court's purpose in approving these visits was also consistent with regulation 9, since the court did not order visitation as a preliminary step toward placement, but merely to provide contact of short duration between a child and his father. The ICPC has no application in this context.

B. *Prior ICPC Evaluation Did Not Convert Visits into a Placement*

Despite the obvious intention of the juvenile court and all parties to facilitate mere visits between Emmanuel and his father, the Agency contends the visits must be *conclusively presumed* to constitute a placement under the ICPC because the Agency previously submitted an ICPC placement request

to Florida authorities and received a negative evaluation of Elijah's home. This argument stems from the following sentence in paragraph 6 of regulation 9: "A request for a home study or supervision made by the person or agency which sends or proposes to send a child on a visit will conclusively establish that the intent of the stay or proposed stay is not a visit." Although a literal reading of this statement might appear to support the Agency's position, imposing such a conclusive presumption poses several problems.

As an initial matter, it is unclear whether the quoted language from regulation 9 applies, by its own terms, to the situation before us. Regulation 9's conclusive presumption comes into play only when the party who requested an ICPC home study is the *same party* who also proposes to send the child on a visit. Despite the Agency's protestation to the contrary, the party who requested an ICPC study of Elijah's home is far from clear in the appellate record. While the Agency's caseworker testified that Elijah requested the study, correspondence from Florida child welfare authorities, the Agency's own status review reports, and a brief the Agency submitted below all state that the Agency initiated the ICPC evaluation. If the Agency was the "requesting party," respondents assert, the presumption does not apply because the Agency is not the same party who proposes to send Emmanuel to Florida. On the contrary, the Agency vehemently opposes the visit.

These semantic difficulties highlight the importance of discerning the rationale behind regulation 9's conclusive presumption. In directing cooperation between member states in the placement of children, the ICPC seeks, in part, to give authorities in a state where a child may be placed a "full opportunity to ascertain the circumstances of the proposed placement." (Fam. Code, § 7901, art. 1, subd. (b).) A November 1996 statement prepared by the secretariat of the AAICPC explains this goal of protecting states that receive dependent children for placement: "While protection of children proposed to be placed and actually in placement is paramount consideration [*sic*], protection of the receiving state is also an important purpose. The states have agreed that their public officers (and also private individuals and agencies) placing children from or into their territory are required to follow the procedures of ICPC. This is intended as a protection against receiving states having children 'dumped' upon them. When children are placed without proper preparation, or when interstate placements go awry, the receiving state usually becomes responsible for rescuing the child and is thereafter usually saddled with the burden of finding suitable care and nurturing and paying for it."

Accordingly, in keeping with this goal of protecting receiving states, the ICPC prohibits conditional or contingent placement orders. (*In re Luke L.*

(1996) 44 Cal.App.4th 670, 682 [52 Cal.Rptr.2d 53].) ICPC procedures must be completed *before* a member state can order a child sent into another state for placement. (*Id.* at pp. 681-682; Fam. Code, § 7901, art. 3, subds. (b) & (d).) Regulation 9 serves this statutory purpose. Regulation 9 presumes that if a state requests an evaluation of a home for placement of a child under the ICPC, a later attempt by the state to send that child into the out-of-state home constitutes a step toward the sending state's expressed goal of placement. If a state sends a child into a home for placement prior to completion of ICPC procedures, the "sending" is equivalent to a conditional or contingent placement barred by the ICPC. (*In re Luke L.*, *supra*, at p. 682.) Essentially, regulation 9 seeks to prevent states from making an end run around the ban on contingent placement orders by disguising such orders as "visits."

A similar situation arose in the *Luke L.* case. In February of 1995, a California agency sent an ICPC request to Illinois for evaluation of a possible placement of a child with her cousins. (*In re Luke L.*, *supra*, 44 Cal.App.4th at p. 676.) By May, Illinois authorities had not yet completed the evaluation, but a California court ordered the child placed in Illinois pending completion of the ICPC study and separately authorized a "visit" of the child with her Illinois relatives. (*Ibid.*) The child's mother challenged the visitation order, contending it was truly a placement order and was improperly made before completion of ICPC procedures. (*Id.* at p. 681.) The Third District Court of Appeal agreed that the juvenile court's orders attempted to effect a contingent or conditional placement, which is impermissible under the ICPC. (*Luke L.*, at p. 682.) However, the court observed that a simple visitation order would likely have been appropriate: "Had the court confined its orders to a visit only, we would be inclined to agree with [the Butte County Children's Services Division] that no ICPC issue is presented. (See *Tara S.* v. *Superior Court*, *supra*, 13 Cal.App.4th at p. 1838, fn. 1.) By its terms, the ICPC applies only to a *placement*. (Fam. Code, § 7901, art. 3, subd. (a); but see Fam. Code, § 7901, art. 3, subd. (d).)" (*Ibid.*)[3]

We agree with this dicta from *Luke L.* and hold that regulation 9 does not prohibit bona fide visitation between a child and his natural parent.

■ Parents and children have recognized constitutional interests in visitation. "Visitation rights arise from the very 'fact of parenthood' and the constitutionally protected right ' "to marry, establish a home and bring up

---

[3]Interestingly, in both published cases touching on this topic, the California child welfare agencies involved took the opposite position from that now advanced by the Agency—i.e., they contended a visitation order presents *no* issue under the ICPC. (*In re Luke L.*, *supra*, 44 Cal.App.4th at p. 682; *Tara S. v. Superior Court*, *supra*, 13 Cal.App.4th at p. 1838, fn. 1.)

children." ' [Citation.]" (*In re Julie M.* (1999) 69 Cal.App.4th 41, 49 [81 Cal.Rptr.2d 354].) A reunification plan must provide for visitation between parents and children that is "as frequent as possible, consistent with the well-being of the child" (Welf. & Inst. Code, § 362.1, subd. (a)(1)(A)), and "ordinarily it is improper to suspend or halt visits even after the end of the reunification period. [Citations.] Visitation may be seen as an element critical to promotion of the parents' interest in the care and management of their children, even if actual physical custody is not the outcome. [Citation.]" (*In re Luke L.*, *supra*, 44 Cal.App.4th at p. 679.) Moreover, "the rights of children in their family relationships are at least as fundamental and compelling as those of their parents." (*In re Bridget R.* (1996) 41 Cal.App.4th 1483, 1504 [49 Cal.Rptr.2d 507].)

 Considering these strong constitutional interests and the legislative scheme favoring parental visitation, we reject the Agency's argument that regulation 9 creates an *irrebuttable* presumption against visitation when it follows a request for an ICPC home study. This construction would potentially allow an overzealous child welfare agency to thwart all out-of-state parental visitation simply by submitting an ICPC request. Even assuming the AAICPC intended regulation 9 to bar parental visitation conclusively and indefinitely after denial of an ICPC home study request, we are not bound to follow it. "To the extent that regulations conflict with statutes or decisional law, the law controls the regulations. [Citation.]" (*In re Johnny S.*, *supra*, 40 Cal.App.4th at p. 978.)

 We conclude regulation 9 does not bar a bona fide visitation order between a child and his parents; however, conditional or contingent placement orders disguised as "visitation" remain prohibited. (*In re Luke L.*, *supra*, 44 Cal.App.4th 670, 682.) The visitation ordered in the present case was undoubtedly bona fide. The juvenile court granted Emmanuel permission to see his father in Florida for three short visits, none exceeding four weeks in duration and all during school vacations. That Emmanuel would return to live with his mother in California after each of these trips was implicit in the court's order. In addition, the court clearly stated its intention to permit simple visits between father and son, not trial or temporary placements.

Finally, we note that the conclusive presumption urged by the Agency creates an especially absurd fiction in the present case, in which neither the juvenile court nor the Agency has legal custody of the child in question. A juvenile court has no power to order a permanent placement for a dependent child unless the child has been removed from parental custody pursuant to Welfare and Institutions Code section 361. (Welf. & Inst. Code, § 361.2.)

This statute, in turn, states that the juvenile court may not take a dependent child from the physical custody of a parent unless it finds, by clear and convincing evidence, that certain circumstances in the home pose a substantial risk to the child. (Welf. & Inst. Code, § 361, subd. (c).) The record contains no findings under Welfare and Institutions Code section 361 and no indication the court ever removed Emmanuel and Gabriel from their mother's custody. The dispositional order states only that the "care, custody, control and conduct" of the children is to "be under the supervision of the Social Services Agency." The court did not commit the boys to the custody of the Agency for placement in a suitable home or institution, but allowed them to continue living with their mother. (See Cal. Rules of Court, rule 1456(a)(5) [at the disposition hearing, the court may "[d]eclare dependency, permit the child to remain at home and order that services be provided"].)[4]

The Agency does not seriously dispute that Emmanuel remains in his mother's legal custody. Nor could it, consistent with its own status reports describing the provision of family maintenance (as opposed to reunification) services and its description of Emmanuel's "legal status" in the ICPC request as under "court jurisdiction only," rather than within "sending agency custody/guardianship." Yet the Agency urges that any limitation on parental control is sufficient to invoke all ICPC rules and presumptions concerning placement. Opinions of the secretariat of the AAICPC directly contradict this assertion. Secretariat Opinion 22 states: "The question of custody is not directly addressed by the [ICPC]. It may be assumed that unless the sending agency has custody of the child, or acts on behalf of someone who has custody, it cannot lawfully make any disposition of the child. *Consequently, the ability to exercise powers included within the custody concept is essential to the making of a placement.*" Accordingly, Secretariat Opinion 51 observes that when a request for a home study contains insufficient documentation of the child's removal from parental custody, an ICPC administrator is justified in declining to proceed with the study.

II. *No Abuse of Discretion in Approval of Visitation*

 Next, the Agency contends the juvenile court "exceeded its jurisdiction" in finding the visits to be in Emmanuel's best interest, contrary to the recommendation of Florida authorities who reviewed the father's home for potential placement.

---

[4]If the court had found a substantial risk to the minors necessitating removal from their mother's custody (Welf. & Inst. Code, § 361, subd. (c)), it could not simultaneously "place" them in their mother's home. (*Savannah B. v. Superior Court* (2000) 81 Cal.App.4th 158, 161-162 [96 Cal.Rptr.2d 428]; *In re Andres G.* (1998) 64 Cal.App.4th 476, 481-483 [75 Cal.Rptr.2d 285]; *In re Damonte A.* (1997) 57 Cal.App.4th 894, 899 [67 Cal.Rptr.2d 369].)

■ A juvenile court's determination as to whether parental visits are in the best interests of a dependent child may be reversed only upon a clear showing of abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318 [27 Cal.Rptr.2d 595, 867 P.2d 706]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351-1352 [93 Cal.Rptr.2d 644].) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citation.]" (*In re Stephanie M., supra,* at pp. 318-319.)
■ The court below did not abuse its considerable discretion in concluding the proposed visits were in Emmanuel's best interest.

The juvenile court reviewed all the information about Emmanuel's father set forth in the Florida ICPC study, and, as the Agency correctly points out, some of this information was negative. Elijah has what the ICPC report described as an "extensive" criminal record, with a conviction as recently as 1999 in a drug-related matter. Elijah also has a history with Florida child welfare authorities, who removed his youngest child from his custody based on an allegation of physical abuse but returned the child six months later. However, the court was not bound to adopt the placement recommendation of Florida ICPC authorities when determining whether parental visitation was in Emmanuel's best interest, and the court properly considered several factors weighing in favor of the visits. In several hearings, Emmanuel consistently expressed a desire to visit with his father; Elijah demonstrated similar persistence in pursuing visitation throughout repeated hearings; and Emmanuel's mother also supported the visits, noting the boy's need for a "father figure." In addition, the Florida caseworker gave a positive report of her interview with Elijah, observing that he paid great attention to his daughter and the baby appeared "healthy, happy and well cared for." Perhaps most telling, Emmanuel visited with his father in Florida for over a month during the summer of 2000, and by all indications this visit proceeded in an enjoyable, appropriate manner until it was abruptly terminated by the Agency. In light of this evidence, the court did not abuse its discretion in approving visitation.[5]

III. *Father's Request for Sanctions Against Agency*

■ Finally, Elijah asks this court to consider whether the Agency should be sanctioned for abusing the legal process in its "crusade" to prevent visitation.

---

[5]As an aside, it is highly disingenuous for the Agency to argue visitation is against Emmanuel's best interest when the proposed visits will take place in Florida and also claim "[t]here is nothing stopping" visits between this father and son in California. Either the Agency approves of visits between Emmanuel and Elijah, or it does not.

We agree the Agency has litigated this case in an excessively aggressive manner, with questionable regard for the best interests of the child. After the juvenile court approved a Florida visit in the summer of 2000, the Agency overreacted to information it received from a mere telephone call and—without ever obtaining a modification of the visitation order—obtained an ex parte warrant for the children's arrest. The boys' visit ended with a dramatic arrest and late-night return to California. The Agency continued to overreact when, in an emergency hearing the next day, it sought to remove the children from parental custody and suggested it would file criminal charges against both parents. A few months later, after Elijah expressed a desire to have custody of Emmanuel, the Agency requested an ICPC study from Florida. When Florida authorities denied placement, an Agency caseworker initially suggested the court could approve a summer visit, but, in a dramatic turnaround, the Agency thereafter opposed all visitation in Florida based on the same formalistic legal argument it continues to assert in this appeal—i.e., that Florida's denial of the Agency's ICPC placement request bars, apparently indefinitely, *any* contact between Emmanuel and his father in Florida. Despite the obvious disappointment it has caused all parties (in lost opportunities for visits), the Agency has doggedly pursued this legal issue through two superior court hearings, a writ petition and an appeal.

Nevertheless, we decline to impose sanctions on the Agency for pursuing this appeal. The appeal cannot be deemed frivolous given the important and unsettled legal questions it raises under the ICPC. And while the record suggests questionable motives on the Agency's part, it does not clearly demonstrate the Agency acted in bad faith and for an improper purpose. (Contrast *Los Angeles County Dept. of Children etc. Services v. Superior Court* (1995) 37 Cal.App.4th 439, 456 [43 Cal.Rptr.2d 757].)

### DISPOSITION

The juvenile court's visitation order is affirmed. The stay previously entered shall be lifted immediately upon filing of this opinion.

McGuiness, P. J., and Corrigan, J., concurred.