Filed 2/17/15  In re G.D. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re G.D. et al., Persons Coming Under the Juvenile Court Law. | |
| | D066300 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1150A-C) |
| v. | |
| A.D., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Merrill L. Toole, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Jennifer M. Stone, Deputy County Counsel, for Plaintiff and Respondent.

A.D., Sr., (A.D.) appeals following the termination of his parental rights to his daughter G.D. and his twin sons A.D., Jr., and R.D. (together, the children).  A.D. contends the juvenile court abused its discretion by summarily denying his modification petitions (Welf. & Inst. Code, § 388).[1]  The modification petitions cited the relative placement preference (§ 361.3) and sought the children's removal from the home of nonrelative extended family members (NREFM's) in San Diego and placement with a paternal aunt and uncle in Texas.  We affirm.

## BACKGROUND

In October 2013, the San Diego County Health and Human Services Agency (the Agency) filed dependency petitions for eight-year-old G.D. and seven-year-old twins A.D., Jr., and R.D.  The petitions alleged that A.D. asked the children if he should talk to their mother, M.D.  The children said yes.  A.D. replied that he would have to kill M.D. and solicited the children's involvement in his plan to kill her.  A.D. then killed M.D.  The petitions also alleged that A.D. was incarcerated and unwilling or unable to arrange appropriate and adequate care for the children.

A.D. was jailed and charged with murder.  The children were detained in San Diego with the NREFM's who had been caring for them since September 2013.[2]  At the

---

[1]    Further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]    On October 28, 2013, two days before the Agency filed the dependency petitions, A.D. told the social worker he wanted the paternal aunt to care for the children.  A.D. refused to provide the paternal aunt's contact information.  On October 28, the social worker obtained the telephone number from the NREFM's and called the paternal aunt.

October 31, 2013, detention hearing, A.D.'s counsel requested "an emergency evaluation" of the paternal aunt and uncle in Texas and asked "for an [ICPC]." (The Interstate Compact on Placement of Children (ICPC); Fam. Code, § 7900 et seq.) Counsel acknowledged "that jurisdiction needs to be taken before an [ICPC] can be authorized . . . ." The children's counsel asked that the children remain detained with the NREFM's. The court stated the matter "needs to come back to the court before the children are detained in Texas" and would require the "concurrence of [the children]'s counsel."

The paternal aunt and uncle attended the next hearing in November 2013. A.D.'s counsel said he had "expressed to the Agency as well as [the NREFM's] that [the paternal aunt and uncle] are seeking an [ICPC]." Counsel noted that "[a]lthough[] an [ICPC] will not happen until the court takes jurisdiction, it is likely that the jurisdiction portion of this case may proceed at the settlement conference . . . ." The court authorized supervised visitation for the paternal aunt and uncle and scheduled a settlement conference for December 19 and a contested jurisdictional and dispositional hearing for January 17, 2014.

On December 19, 2013, the court made true findings on the petitions. A.D.'s counsel asked "since the Court has taken jurisdiction today, that an ICPC be ordered" and the children be placed with the paternal aunt and uncle once their home was approved. The court ordered that the "ICPC process to begin." A.D.'s counsel requested a new date

The paternal aunt expressed an interest in caring for the children but did not have a relationship with them.

3

of February 4, 2014, for the dispositional hearing, citing A.D.'s January 17 hearing in another case and "the fact that the ICPC may take some time . . . ." The court found that ICPC proceedings did not constitute good cause for a continuance, but granted the request in light of the conflicting hearing date.

Meanwhile, the children showed signs of trauma. They appeared angry and did not follow instructions. During a forensic interview, R.D. did not acknowledge the interviewer's presence and did not answer any questions. During his forensic interview, A.D., Jr., occasionally smiled and nodded, but did not speak. During her forensic interview, G.D. spoke of A.D.'s murder of M.D. and disclosed that both A.D. and M.D. had hit her. The caregivers reported that A.D., Jr., and R.D. reenacted A.D.'s killing of their mother and behaved aggressively. A.D., Jr., and R.D. refused to speak at school and did not interact with children other than G.D. G.D. had crying episodes.

On February 4, 2014, A.D.'s counsel requested a continuance of the dispositional hearing pending completion of the ICPC process, acknowledging there was "no case law that supports [the] request . . . ." The children's counsel and the Agency's counsel objected. The Agency's counsel stated the Agency had begun the ICPC process and had assessed the paternal aunt. As explained more fully below, the social worker stated that on January 22, the Agency had submitted a request to the Social Security Administration for the children's Social Security cards, and had been told it would take three or four weeks to receive the cards, which were due to arrive "any day." The court denied the continuance request as not in the children's best interests, citing the six-month deadline

4

for making dispositional orders[3] and noting its "experience with Texas [that] the [ICPC] process can sometimes take many, many months." The court proceeded with the dispositional hearing.

The social worker testified that when she was compiling the documentation required for the ICPC process, the Agency's Social Security clerk informed her that the children's Social Security cards had to be reordered because the mother's surname on the cards did not match her surname on the children's birth certificates. The social worker submitted the request for new Social Security cards on December 19, 2013, and the Social Security clerk forwarded the request to the Social Security Administration on January 22, 2014.

The social worker testified the children were in therapy. The children spoke to their caregivers but did not talk to strangers. The children did not speak to the social worker, but had recently made eye contact with her and, for the first time, smiled and laughed in her presence. G.D. felt responsible for her mother's death and was "beginning to process it." G.D. was adjusting to her placement; the adjustment was eased because she was with her siblings.

Following this testimony, A.D.'s counsel renewed the continuance request. The children's counsel and the Agency's counsel again stated their opposition. The court denied the renewed request, noting "[i]t's completely speculative as to how soon any information would be received." The court stated: "It's the court's experience that it

---

3     The deadline for completing the dispositional hearing was May 1, 2014, six months after the detention hearing. (§ 352, subd. (b).)

takes multiple months, usually sometimes longer, particularly with the [S]tate of Texas." The court cited the fact that the children had been "horribly traumatized" and needed an expeditious decision regarding placement. The court concluded there was not good cause for a continuance and a continuance was not in the children's best interests.

After cross-examining the social worker, A.D.'s counsel again asked for a continuance. The court denied the request, ordered the children removed from A.D.'s custody and placed with the NREFM's, denied reunification services and set a section 366.26 hearing. The court directed the Agency, upon receipt of the children's Social Security information, to forward ICPC information to Texas for evaluation of the paternal aunt and uncle.

On March 27, 2014, the Texas Department of Family and Protective Services approved the home of the paternal aunt and uncle for the children's placement. In June, A.D. filed his section 388 petitions. The court summarily denied the section 388 petitions. In July, the court terminated parental rights.

DISCUSSION

I

*Applicable Law*

To obtain a hearing on a section 388 petition, the proponent must make a prima facie showing that circumstances have changed and the proposed modification would be in the children's best interests. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; *In re Justice P.* (2004) 123 Cal.App.4th 181, 188.) "It is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must show that the

6

undoing of the prior order would be in the best interests of the child." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529.) The petition should be liberally construed in favor of granting a hearing, but "[t]he prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*In re Zachary G.*, at p. 806.) "In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (*In re Justice P.*, at p. 189.) When reunification services have been denied, the focus is on the children's need for permanency and stability. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) We review the summary denial of a section 388 petition for abuse of discretion. (*In re Zachary G.*, at p. 808; *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413; *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 433.)

The relative placement preference, cited in A.D.'s modification petitions, gives "preferential consideration" to placement requests by certain relatives upon the child's removal from the parent's physical custody at the dispositional hearing. (§ 361.3, subds. (a), (c); *In re Lauren R.* (2007) 148 Cal.App.4th 841, 854.) " 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) "Preferential consideration 'does not create an evidentiary presumption in favor of a relative, but merely places the relative at the head of the line when the court is determining which placement is in the child's best interests.' " (*In re Antonio G.* (2007) 159 Cal.App.4th 369, 376.) After the dispositional hearing, the relative placement preference does not arise again until "a new placement of the child must be made." (§ 361.3, subd. (d), quoted in *In re Lauren R.*, at p. 854.)

7

As discussed below, A.D.'s arguments also involve the ICPC. "Both California and Texas have signed the ICPC and enacted statutes codifying its provisions. [Citations.] The purpose of the ICPC is to facilitate cooperation between participating states in the placement and monitoring of dependent children. [Citation.] Article 2 defines 'Placement' as 'the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution . . . .' (Fam. Code, § 7901, art. 2, subd. (d).) [¶] Article 3 . . . mandates that the child shall not be sent into the receiving state 'until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child.' (Fam. Code, § 7901, art. 3, subd. (d).) [¶] Article 5 of the ICPC requires the sending agency to retain jurisdiction over the child 'until the child is adopted, reaches majority, becomes self-supporting, or is discharged with the concurrence of the appropriate authority in the receiving state.' " (*In re Johnny S.* (1995) 40 Cal.App.4th 969, 974-975, fn. omitted.) Expedited ICPC proceedings are not available for children older than four years. (Cal. Rules of Court, rule 5.616(h)(2)(B).)

II

*Analysis*

A.D.'s modification petitions sought the children's removal from the home of NREFM's in San Diego and placement with the paternal aunt and uncle in Texas. As changed circumstances, the petitions alleged that in March 2014, the paternal aunt and uncle "took active steps to begin the ICPC process;" that month, Texas approved their home for the children's placement; in June, the paternal aunt and uncle submitted to a

8

background check including fingerprinting; the paternal aunt and uncle and their family had visited the children; and the paternal aunt had called to check on the children's well-being. The court found that A.D. had made a prima facie showing of changed circumstances,[4] but had not made a prima facie showing the proposed modification was in the children's best interests.

Because the court found that A.D. had made a prima facie showing of changed circumstances, we need only discuss whether the court abused its discretion by finding he had not made a prima facie showing that granting the petitions would be in the children's best interests. In this regard, the petitions cited the relative placement preference and alleged the paternal aunt and uncle could meet the children's needs and "provide a long-term home" and "a sense of family." In finding that A.D. had not made a prima facie showing regarding the children's best interests, the court stated the following: On the eve of the section 366.26 hearing, the focus was on the children's need for permanency and stability. The children had "been hugely traumatized." The paternal aunt and uncle had first seen the children at their mother's funeral, had never lived with them and did not have a full understanding of their day-to-day needs. The children were secure in the home of the NREFM's, who had met their needs during "the first stage of a very rough time" and were committed to the children long term.

---

4    Specifically, the court found "the paternal relatives have very willingly engaged in the [ICPC] process," their home had been approved and was a "high caliber home" and the paternal relatives were "very aware that there would be a[n] adjustment period" and were "very willing to . . . avail themselves of services and do what it is that they need to do for the children."

A.D. contends that until the December 19, 2013, jurisdictional hearing, the Agency and the court ignored his requests for an evaluation of the paternal aunt and uncle's home and the children's placement in that home. A.D. argues that as a result, the home had not been evaluated at the time of the February 2014 dispositional hearing, and this caused the paternal aunt and uncle to fall "from being first in line for placement" under the relative placement preference, "without any input from the juvenile court."

A.D. acknowledged in the juvenile court, as he acknowledges on appeal, that the court cannot order the institution of ICPC proceedings before it has taken jurisdiction. Here, the court ordered ICPC proceedings at its earliest opportunity, immediately after it made jurisdictional findings. The court also granted A.D.'s initial request to continue the dispositional hearing. The court denied his subsequent continuance requests, citing the "multiple months" required for the ICPC process, the children's fragile emotional condition and their need for stability and permanency, and A.D. did not obtain review of those denials.

The children had endured the trauma of losing their mother at A.D.'s hands. At the time the court summarily denied the section 388 petitions, the children had been living with the NREFM's for nine months. The NREFM's had provided the children with love, security and stability and the children had slowly made progress in recovering from the trauma. They were bonded with the NREFM's, who wished to adopt them. As reunification services had been denied, the focus was on the children's need for permanency and stability. The attainment of that goal had already been delayed when the court granted A.D.'s request to continue the dispositional hearing even further beyond the

10

60-day period following the detention hearing, a situation requiring a finding of "exceptional circumstances." (§ 352, subd. (b).) Any change in placement—no matter how suitable the new placement—would not further the need of these fragile children for stability. The court did not abuse its discretion by summarily denying the section 388 petitions.

In any case, any error in summarily denying the modification petitions would be harmless. A prima facie showing of best interests requires something beyond the bare statement the proposed modification would be in the children's best interests. Here, there is nothing more than a bare statement. No information cited in the petitions or appearing anywhere in the record provides the slightest suggestion that the proposed modification would have been in the best interests of these traumatized and fragile children. Even if the relative preference applied, it would not take precedence over the children's best interests, the overriding concern here. (*Samantha T. v. Superior Court* (2011) 197 Cal.App.4th 94, 113.)

## DISPOSITION

The judgment is affirmed.


HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


McINTYRE, J.

11